**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALLEN ROBINSON,

   *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.

_____/

     CASE NO. 17-cv-12202

     DISTRICT JUDGE NANCY G. EDMUNDS

     MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 10, 12)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 10), be **DENIED**, that the Commissioner's Motion, (Doc. 12), be **GRANTED**, and that this case be **AFFIRMED.**

## II.  REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Allen Robinson's claim for Social Security Supplemental Insurance benefits ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1383f. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 3). The

1

matter is currently before the court on cross-motions for summary judgment. (Docs. 10, 12). Plaintiff has also filed a response to Defendant's motion. (Doc. 13).

Plaintiff was born on August 25, 1973, making him 41 years old when he filed for SSI on September 19, 2014, alleging an onset date of July 1, 2013. (Tr. 44, 157). An initial denial for his SSI claim issued on January 29, 2015. (Tr. 97). At Plaintiff's request, an administrative hearing was held on April 11, 2016, before Administrative Law Judge ("ALJ") Kevin R. Barnes; Plaintiff and Vocational Expert ("VE") Stephanie Leach both testified. (Tr. 36–81). The following month, the ALJ issued a decision denying Plaintiff's claim. (Tr. 17–31). In May 2017, the Appeals Council denied Plaintiff's request for review.[1] (Tr. 1–4). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."

---

[1] **Error! Main Document Only.**The Appeals Council acknowledged it had received additional evidence from Plaintiff in the form of an "Informal Request For Review of Hearing Decision/Order." (Tr. 4–5). In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

*Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

[he or] she is precluded from performing [his or] her past relevant work." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been disabled under the Act since September 19, 2014, the date Plaintiff filed his application. (Tr. 22–23). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. 22). At step two, he determined that Plaintiff had the following severe impairments: degenerative osteoarthritic changes of the bilateral hands and bilateral knees; degenerative disc disease of the lumbar spine with sacroilitis; schizoaffective disorder; asthma; and depressive disorder. (*Id.*). Moving on to step three, he decided Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 23). The ALJ next concluded that Plaintiff had the residual functional capacity to

perform sedentary work as defined in 20 CFR 416.967(a) except can lift or carry 10 pounds occasionally; occasional pushing or pulling bilaterally; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs, balancing stooping, kneeling, crouching, and crawling; avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation; requires the ability to sit or stand alternatively at will, provided that the claimant is not off task for more than 10% of the workday; work must be isolated from the public with only occasional interaction with coworkers; and is limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions and few, if any workplace changes.

(Tr. 25). Plaintiff had no past relevant work, so the ALJ proceeded to Step Five, where he found that considering Plaintiff's age, education, work experience, and RFC, jobs that Plaintiff could perform existed in significant numbers in the national economy. (Tr. 30).

### E. Administrative Record

#### 1.    Medical Evidence

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.  Plaintiff's Function Report

Plaintiff completed a function report on November 16, 2014. (Tr. 193–200). He reported that he lived alone in a house. (Tr. 193). On an average day, he would wake up and put pressure on his back to stop the pain, get up and walk around to stretch, and then

sit in bed and talk to his mother. (Tr. 194). To stay occupied, he would watch television in bed and talk to his family members. (Tr. 197–98).[2]

He did not go outside because, he said, "I don't care to know what's outside"; he was also "afraid that [he] may hurt somebody." (Tr. 196–97). Instead, his sister or brother went shopping for him. (Tr. 196). He estimated that he prepared his own meals weekly, including sandwiches and frozen dinners, and that it took about twenty minutes. (Tr. 195).

At his mother's request, Plaintiff would clean his room, but he was unable to say how often or how long it took. (Tr. 195). As his back hurt "constantly," he found it difficult to clean. (Tr. 196). His mother also reminded him to take his medication and to take care of his personal needs and grooming. (Tr. 195).

Plaintiff struggled with social behavior. He described himself as "anti-social" and wrote that he "follow[ed] prison rules." (Tr. 197). A question asking how well he got along with authority figures drew a response laced with profanity. (Tr. 199). Plaintiff also reported he had been fired or laid off from a job because of problems getting along with other people, explaining, "I shout [expletive] and say what's on my mind with no problems." (Tr. 199).

Due to degenerative osteoarthritis in his hands and back, he suffered from constant back pain, morning stiffness, and aching joints. (Tr. 193). His sleep was troubled because

---

[2] Although Plaintiff also wrote in his function report, "I don't have any family," (Tr. 198), he mentioned regularly interacting with his mother, stepfather, sister, and brother in the same document, (Tr. 193–200), and his sister submitted a third-party function report, (Tr. 201–08). His sister's function report, however, suggests that his mother was deceased at the time Plaintiff completed his function report. *Cf.* (Tr. 200 and 206).

he was "constantly in pain from [his] lower back" and heard the sounds of "bones poppin[g]." (Tr. 194). Joint stiffness and aching fingers made it difficult to dress, care for his hair, and shave. (Tr. 194). Sitting for long periods of time hurt his back, affecting his ability to bathe and use the toilet. (Tr. 194).

Additionally, his impairments affected his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, use his hands, and get along with others. (Tr. 198). By Plaintiff's estimate, he could walk fifteen to twenty minutes before needing to stop and rest for thirty to forty minutes. (Tr. 198). As for assistive devices, he indicated that he used a wheelchair, cane, brace or splint, and glasses or contact lenses every day, none of which had been prescribed by a doctor. (Tr. 199).

### b.  Third Party Function Report

Plaintiff's sister, Anita Robinson, also completed a function report for him. (Tr. 201–08). She had known Plaintiff since birth but said she now spent "not that much time" with him because she had children to take care of. (Tr. 201). When she saw her brother, he was in bed talking to himself "and with his imaginary friends." (Tr. 201). He spent most of the time "in bed from pain," despite his sister's efforts to convince him to leave the house. (Tr. 204). He did not shop. (Tr. 204). He could not go out alone because he believed people were trying to harm him and would become defensive. (Tr. 204). For entertainment, he read or watched television. (Tr. 205). He rarely spent time with others and did not get along well with authority figures. (Tr. 205, 207).  His sister reported that

he was depressed about the death of his mother in May 2013 and his father in October 2014. (Tr. 206).

Some questions she was either unable to answer because she was "not there with him all the time" or because she did not understand what was being asked of her. (Tr. 202). She did report that he was able to prepare sandwiches and frozen dinners, but that he had difficulty due to the arthritis in his hands and back. (Tr. 203).

Further, she stated that his impairments affected his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others. (Tr. 206). By her estimate, he could walk ten to twenty minutes before needing to stop and rest for thirty minutes. (Tr. 206). She expressed that he had difficulty finishing what he started and following spoken instructions. (Tr. 206). He used a cane, wheelchair, brace or splint, and glasses or contact lenses, none of which had been prescribed by a doctor. (Tr. 207).

Finally, she noted that Plaintiff had spent twenty-three years in prison. (Tr. 202).

### c.  Plaintiff's Testimony at the Administrative Hearing

An administrative hearing was held in Plaintiff's case on April 11, 2016, before ALJ Kevin R. Barnes, (Tr. 36–81), at which Plaintiff testified. (Tr. 44–70). He began by answering the ALJ's preliminary questions; he was forty-two years old at the time of the hearing, five feet, eight inches tall, and 121 pounds. (Tr. 44). He had recently lost thirty-four pounds. (Tr. 44). He was not married. He had two sons, ages seven and eight. (Tr. 45).

Plaintiff said he currently lived alone in a house that belonged to his sister, who "might let [him] stay there two or three days" and then he would "have to find somewhere else to go and stay." (Tr. 45–46). Although he had a driver's license, he had not driven in the past year, instead opting to use public transportation. (Tr. 46).

As for his educational background, he had acquired his GED in June 2001, and received a certification in paralegal technology from Wayne County Community College in 2014. (Tr. 46–47).

The ALJ then moved on to Plaintiff's prior work experience. The ALJ disregarded Plaintiff's previous position as a pizza baker, which he had held more than fifteen years ago. (Tr. 72). Besides that job, Plaintiff had worked for Minuteman Staffing, a temporary hiring service, from May to July of 2006. (Tr. 49–50). There, the most he had to lift was about forty pounds. (Tr. 52).

Next, Serve Pro Restoration hired him through Minuteman Staffing to work from July to December of 2006. (Tr. 49–50). His duties at that job included cleaning, in the course of which he "had to lift cable wires, barrels, machinery equipment, and stuff like that," weighing up to forty pounds, for restoration jobs or similar. (Tr. 51). As another example of his duties, he offered that he had to "do dry icing" to treat mold. (Tr. 51).

Following that job, he worked at USA One Staffing Temp Service in June 2007. (Tr. 49). His responsibilities included "doing . . . automobile stuff"; pain in his hands and back rendered him unable to lift the parts he was asked to, which could weigh over sixty pounds. (Tr. 51–53).

10

According to Plaintiff, he became disabled on July 1, 2013. (Tr. 47). He was released from prison on July 5, 2013, and had not worked anywhere since. (Tr. 47–49). He had applied for jobs at Wendy's and Bargain's Office Equipment because he knew supervisors there, without success. (Tr. 53). In 2013 and 2014, he had been searching for work but then his back pain "started constantly requiring [him] to go to the hospital." (Tr. 64). He last looked for work in 2015. (Tr. 65). He believed he was unable to work because of the pain in his back, hands, and wrists. (Tr. 53–54).

Plaintiff described how every morning he had difficulty getting out of bed due to pain in his back that ran into his legs and sometimes also caused numbness in his legs. (Tr. 54). To deal with the pain, he took medication, rested, used heat treatments, and did exercises. (Tr. 54). It could take as long as forty-five minutes before he was able to get up in the morning, and he found walking, sitting, and exercising progressively more difficult as the day went on. (Tr. 55).

His daily routine involved "getting up, dealing with the pain" and then calling his sister or others to catch up "just for a minute." (Tr. 61). He would then sit or lie back down and read the paper or watch the news. (Tr. 61–62). For meals, he ate soup or a peanut butter and jelly sandwich. (Tr. 63). He went grocery shopping once a month; his sister went shopping for him more often. (Tr. 63). As for yard work, he could sweep off the porch and rake the grass. (Tr. 63). He was able to clean the house, but after cleaning, he would have to rest and use heat treatments. (Tr. 63–64).

Plaintiff stated, "If I don't have the treatment, the pain is—it's like it's intolerable." (Tr. 55). He was unable to answer the ALJ's follow-up question about what

treatment he was referring to. (Tr. 55). He said that normally sleep helped improve the pain. (Tr. 55–56). He also found relief from using a hot water bottle on his back and lying down. (Tr. 68). In the past, he had taken Norco, Vicodin, methotrexate, and Meloxicam, but complained that some of the medications "had serious side effects and a lot of the side effects . . . would cause me to go to sleep just to try . . . to stay focused on alleviating this pain." (Tr. 56).

He explained that he was not taking any medications at the time of the hearing because he had been experiencing healthcare coverage issues. (Tr. 56). He lost healthcare coverage in the beginning of 2015, secured coverage again for a while, lost it again in September 2015, and then secured coverage in April 2016. (Tr. 69–70). He wanted to return to see Dr. Cheney and a rheumatologist he had seen in Saginaw, Michigan, somewhere between 1989 and 1991. (Tr. 70).

Additionally, Plaintiff complained of hand pain so severe that he could not hold a cup of milk without dropping it. (Tr. 56). He estimated he could hold a gallon of milk for about two minutes. (Tr. 59). He was able to turn a knob and use a remote control. (Tr. 60). He was left-handed; he had more problems with his right hand. (Tr. 61).

By Plaintiff's estimate, he could stand from ten to twenty minutes at a time; he could not walk the length of a city block without stopping every thirty to forty seconds to take a couple of breaths, "deal with this pain and then keep pushing myself." (Tr. 59–60). He could sit for ten to twenty minutes at a time before needing to reposition himself. (Tr. 60). Bending at the waist hurt "like somebody's going to tear [him] apart." (Tr. 62). He had difficulty defecating because it required him "to bend and sit down." (Tr. 62).

Regarding his social skills, he said that he did not interact with people on a day-to-day basis because he had been incarcerated for twenty-three years and no longer knew how to socialize. (Tr. 57). When alone, he felt content and calm. (Tr. 58). He was, however, able to visit with one or two people who came to check up on him regularly, including his sister. (Tr. 58). His mother had died in May 2013, a month before he was released, and his father died soon after. (Tr. 66).

He had not been prescribed any kind of medication for mental health. (Tr. 67).

### d. The Vocational Expert's Testimony at the Administrative Hearing

VE Stephanie Leach also testified at the administrative hearing. (Tr. 71–81). She began by classifying Plaintiff's previous work as home restoration service cleaner (semiskilled, heavy, performed at medium), and auto production worker, (unskilled, medium, performed at heavy). (Tr. 73). The ALJ then posed his first hypothetical:

> [A]ssume a hypothetical individual of the claimant's age, education, and work experience as per the skill set and is able to perform with the following limitations: lift or carry 20 pounds occasionally/10 pounds frequently; stand and/or walk for approximately six hours in an eight-hour day; sit for approximately two hours in an eight-hour day with normal breaks; push or pull bilateral frequently; and occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; balancing, stooping, kneeling, crouching, and crawling are all occasionally while avoiding even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.

(Tr. 73–74).

The VE testified that the hypothetical person would not be able to perform Plaintiff's past work as he performed it or as it is customarily performed because, among other reasons, the work involved exposure to fumes and greater physical demands than

the hypothetical allowed. (Tr. 74). Other jobs would meet the hypothetical's criteria, however: a reduced range of unskilled office clerk positions (200,000 in the national economy); some bench assembly positions (40,000 nationally); and a reduced range of reception and information clerk positions (120,000 nationally). (Tr. 74–75).

> Moving on to his second hypothetical, the ALJ asked the VE to
>
> assume a hypothetical individual with the claimant's age, education, work experience, and skill set who is able to perform with [the] same limitations as the first hypothetical. However, in addition to those limitations, the claimant has the following additional limitations: lift or carry 10 pounds occasionally; stand and/or walk for approximately two hours in an eight-hour day; sit for approximately six hours in an eight-hour day with normal breaks; push or pull bilaterally occasionally; never climb[] ladders, ropes, or scaffolds; and occasionally on all the other posturals and maintaining the environmental.

(Tr. 75). With those limitations, the hypothetical person would not be able to perform Plaintiff's past work as he performed it or as it was generally performed. (Tr. 75–76). There would be other work available at the sedentary level, including a reduced range of unskilled office clerk positions (80,000 nationally); a reduced range of reception and information clerk positions (50,000 nationally); and a reduced range of work as a surveillance system monitor (15,000 nationally). (Tr. 76).

> For the third hypothetical, the ALJ instructed the VE to
>
> assume a hypothetical individual of the claimant's age, education, work experience, and skill set who's able to perform at the same limitations as the second hypothetical. However, in addition, the claimant . . . would be able to sit or stand alternatively at will provided the employee is not off task more than 10 percent of the workday and additionally work would be isolated from the public with only occasional interaction with coworkers and work would be limited to . . . simple, routine, or repetitive tasks performed in a work environment free of fast-paced production

14

requirements involving only simple work-related decisions with few, if any, workplace changes.

(Tr. 76–77). The VE testified that there would be some unskilled office clerk positions remaining (25,000 nationally); a reduced range of bench assembly positions (20,000 nationally); and a reduced range of packer positions (15,000 nationally). (Tr. 77).

Finally, the ALJ asked the VE to consider a hypothetical person with the same limitations as in the previous hypothetical, but who would also be off-task twenty percent of the time due to his impairments. (Tr. 77). The VE responded that no work would be available, because a person could be off-task a maximum of fifteen percent of the day in unskilled work. (Tr. 78).

Following up, Plaintiff's attorney asked the VE whether any competitive employment would be available in the national economy for a person who, due to having "good days and bad days," would likely miss more than four work days per month. (Tr. 78). The VE replied that there would not; employers at the unskilled level generally allowed one unexcused absence per month. (Tr. 78).

Lastly, the VE clarified that her opinions related to absenteeism, time off-task, fast-paced production, and sit/stand were based on her professional experience placing people in jobs rather than on the Dictionary of Occupational Titles. (Tr. 78–79).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable

medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors

16

to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination[3]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists; the ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of*

---

[3] On March 28, 2016, SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseded and replaced SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). The Social Security Administration explained in SSR 16-3p that the ruling's main purpose was to eliminate the term "credibility," and thereby "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 WL 1119029, at *1 n.1.

*Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. 16-3p, 2016 WL 1119029, at *5.  Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at *7. Furthermore, the claimant's work history and the consistency of his subjective statements are also relevant. 20 C.F.R. § 404.1527(c); 16-3p, 2016 WL 1119029, at *8.

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Plaintiff's motion for summary judgment is sparsely argued and at times abstruse, but his primary contention appears to be that the ALJ erred at Step Two by finding rheumatoid arthritis not a medically determinable impairment. *See* (Doc. 10). Plaintiff also touches briefly on issues of credibility and the weight assigned to treating physicians' opinions, each of which I will address in turn. (*Id.* at ID 397–98).

> **1. Whether the ALJ Erred at Step Two By Failing To Consider Signs of Rheumatoid Arthritis Before Concluding It Was Not A Medically Determinable Impairment.**

First, Plaintiff argues the ALJ lacked substantial evidence for his finding that Plaintiff's rheumatoid arthritis was not a medically determinable impairment. The ALJ determined that Plaintiff had the following severe impairments: degenerative osteoarthritic changes of the bilateral hands and bilateral knees, degenerative disc disease of the lumbar spine with sacroilitis, schizoaffective disorder, asthma, and depressive disorder. (Tr. 22). He further found that Plaintiff had the following non-severe

impairments: migraine headaches, nicotine abuse disorder, and substance addiction disorder. (Tr. 22). Plaintiff takes issue only with the ALJ's finding that his rheumatoid arthritis was not a medically determinable impairment. (Tr. 23).

Section 1614(a)(3)(D) of the Social Security Act defines a "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Those two types of evidence are further defined for claimants in the Code of Federal Regulations:

> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. . . . .
>
> (c) Laboratory findings are anatomical, psychological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques.

20 C.F.R. § 404.1528 (Eff. Mar. 31, 2006 to Mar. 26, 2017). A medically determinable impairment may not be established solely on the basis of a claimant's "symptoms," meaning his own description of his impairment. 20 C.F.R § 404.1528(a). The Sixth Circuit applies a *de minimis* standard to determine whether an ailment crosses the threshold to be considered a medically determinable, non-severe impairment. The principle aim of its application is to "screen out those claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted).

Here, although the ALJ acknowledged that Plaintiff "was diagnosed by multiple physicians with rheumatoid arthritis," he found it was not a medically determinable

impairment because the diagnoses were "based upon the claimant's reports and no diagnostic evidence." (Tr. 23). More specifically, the ALJ explained: "As there is no diagnostic lab result[] showing a positive rheumatoid factor, I find that rheumatoid arthritis is not a medically determinable impairment." (Tr. 23).

It would not be wholly accurate, however, to assert that Plaintiff's multiple diagnoses of rheumatoid arthritis were all based solely on his self-reported symptoms or history. Over the course of Plaintiff's medical treatment record, multiple medical care providers who diagnosed rheumatoid arthritis first observed *signs* of it. (Tr. 242, 246, 270, 307).

For example, at a January 2013 appointment where rheumatoid arthritis was diagnosed, the examiner noted "arthritic changes [in his] hands and digits," though "no hot red swo[l]len joints." (Tr. 242). The examiner found no abnormality in Plaintiff's back, with no tenderness, normal flexion, normal extension, normal lateral flexion, normal rotation, and negative straight leg raising tests. (Tr. 242).

Several months later, in March 2013, a provider observed "[r]heumatologic manifestations" in Plaintiff's back, along with tenderness and mild pain with motion, and "mild RA changes" in both his right and left hands. (Tr. 246).

In August 2013, a consultative examiner observed nodules on both hands and slightly decreased range of motion in the interphalangeal joints with nodules. (Tr. 270). The report concluded he had rheumatoid arthritis. (*Id.*).

About six months later, in February 2014, Plaintiff went to the emergency department with back pain, where he reported a history of rheumatoid arthritis and a provider noted his hands had features of that disease. (Tr. 302–07).

In June 2015, Plaintiff visited Dr. Chaney with complaints of pain in his hands and back. (Tr. 356). She noted a history of rheumatoid arthritis and referred Plaintiff to a rheumatologist. (Tr. 356). That same day, she penned a letter stating that Plaintiff was "totally disabled due to rheumatoid arthritis." (Tr. 325).  Views of Plaintiff's hands taken several days later were "negative" for the right hand; the left hand showed "[i]nterval bony ankyloses of the DIP joint of the fourth digit since prior exam" and "unremarkable" soft tissues. (Tr. 359). His lumbar spine evidenced "[m]ild degenerative changes [at] L2 and L3." (Tr. 363).

Several months later, Plaintiff saw a rheumatologist, who wrote that the physical exam "suggests inflammatory arthritis, although he has Bouchard nodes." (Tr. 346). The rheumatologist indicated Plaintiff would complete lab work and then "come back in a week for a final evaluation." (Tr. 346). Plaintiff did not return or complete the diagnostic lab to test for a rheumatoid factor.

The following month, Plaintiff saw Dr. Chaney, who again assessed him with rheumatoid arthritis after noting palpable tenderness in his lower lumbar spine and decreased range of motion to flexion, as well as soft tissue swelling of the MCP joint in both hands. (Tr. 352). Plaintiff complained of "severe" joint stiffness and lower back pain. (Tr. 352). Dr. Chaney wrote a second letter, identical to the first, stating Plaintiff was totally disabled by rheumatoid arthritis. (Tr. 324).

23

Admittedly, the above survey of the record focuses on appointments at which examiners diagnosed or noted medical signs of rheumatoid arthritis; Plaintiff also attended multiple appointments at which the examiner did not note such features. *E.g.*, (282–84, 285–87, 288–90, 291–98, 299–301, 327–43).

Regardless, it appears that in his analysis of whether rheumatoid arthritis was a medically determinable impairment, the ALJ failed to consider *any* of the medical signs of rheumatoid arthritis in the record. It is true that later in his opinion, while explaining his RFC determination, the ALJ thoroughly described the medical record, including the above signs. (Tr. 26–29). But it would be difficult to credit the ALJ with having implicitly considered them at Step Two, when he explicitly stated the sole reason for his determination there was the lack of a "diagnostic lab result[] showing a positive rheumatoid factor." (Tr. 23).

Later in the ALJ's opinion, too, he stated that one physician's "diagnosis of rheumatoid arthritis . . .  was made on the claimant's subjective reports, as there are no lab results in the record showing a positive rheumatoid factor." (Tr. 29). Again, it would appear the ALJ assumed that because the record contained no test for a rheumatoid factor, all diagnoses of rheumatoid arthritis must have been made solely on Plaintiff's subjective reports. In other words, the ALJ contemplated that only two types of evidence might be relevant to his analysis: Plaintiff's symptoms, and a rheumatoid factor test. But that leaves no room in the analysis for signs such as those described above, or indeed even for laboratory findings besides a rheumatoid factor test. Therefore, I would suggest that the ALJ erred in finding rheumatoid arthritis could not be a medically determinable

24

impairment in the absence of testing for a rheumatoid factor, without addressing the relevant signs in the medical record.

The next question, then, is whether the ALJ's error was harmless. Defendant argues that even if the ALJ erred at step two, "that error is without consequence, because the ALJ found other severe impairments and continued beyond step two of the evaluation." (Doc. 12 at ID 414). In support, Defendant cites *Pompa*, where the Sixth Circuit held that because the ALJ found the claimant had a severe impairment at Step Two, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). But the instant issue is *not* whether the ALJ characterized the alleged impairment as severe or not severe—it is whether the ALJ found it a medically determinable impairment at all. *Pompa*'s logic is that beyond Step Two, the ALJ *must* consider both severe and non-severe impairments in determining the claimant's RFC, so it matters little whether any given impairment was earlier classified as severe or non-severe. *See id*. (citing 20 C.F.R. § 404.1545(e)) ("[W]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). There exists no analogous requirement for the ALJ to account for non-medically determinable impairments past step two, and so it does not necessarily follow that "it matters little" whether the ALJ erred.

Unconvincing as that argument may be, however, Defendant is correct that Plaintiff has failed to carry his burden of demonstrating his need for a more restrictive RFC. Doc. 12 at ID 414–15 (citing *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423

(6th Cir. 2008) (claimant bears the burden of demonstrating need for more restrictive RFC)). Even reading Plaintiff's brief most generously, he at best argues that had the ALJ considered his subjective *symptoms*, "the RFC would have been altered as claimant would have had difficulties with using his hands for any tasks[;] this was not considered by the ALJ at all in his RFC determination." (Doc. 10 at ID 398). Not only does Plaintiff apparently confuse the issue, he also mistakes the facts. The ALJ explicitly accounted for Plaintiff's difficulties using his hands—albeit due to "degenerative osteoarthritic changes of the bilateral hands and bilateral knees," instead of rheumatoid arthritis—by limiting him to sedentary work with additional postural restrictions and the ability to sit and stand at will, as well as by restricting him to only occasionally pushing and pulling bilaterally. (Tr. 27). Because Plaintiff failed to name even one additional functional restriction that would be warranted if rheumatoid arthritis were found to be a medically determinable impairment, I would suggest that the ALJ's error at step two was harmless.

### 2.     Plaintiff Waived Any Challenge to The ALJ's Treatment of His Statements Regarding His Alleged Rheumatoid Arthritis.

Plaintiff's brief also includes some language regarding credibility that suggests he wishes to challenge how much weight the ALJ gave Plaintiff's reports of his symptoms. Specifically, Plaintiff regurgitates SSR 96-7p, which required the ALJ to explain his credibility determinations in a manner "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). As Defendant points out, SSR 96-7p has been superseded by SSR 16-3p

for any case decided on or after March 28, 2016, as this case was.[4] (Doc. 12 at ID 417). In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

Here, Plaintiff complains that "[i]n the matter at hand the ALJ found the claimant's statements as to his RA and significant pain to be purely subjective and therefore he did not use those issues in his determination of Claimant's RFC." (Doc. 10 at 398). Setting aside the somewhat confused assertion that the ALJ erred by finding the claimant's statements about his symptoms to be subjective, I turn to Plaintiff's argument that the ALJ did not use Plaintiff's testimony regarding his rheumatoid arthritis in determining his RFC. Unfortunately, Plaintiff does not go on to present any reason whatsoever for the court to disturb the ALJ's analysis of Plaintiff's testimony, let alone a compelling one. In the absence of any alleged reason to disturb the ALJ's findings here, I suggest that Plaintiff has waived this argument and it would be inappropriate to find error on this ground. *See United States v. Johnson*, 440 F.3d 832, at 845–46 (6th Cir. 2006)

---

[4] On March 28, 2016, SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseded and replaced SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). The Social Security Administration explained in SSR 16-3p that the ruling's main purpose was to eliminate the term "credibility," and thereby "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 WL 1119029, at *1 n.1.

(explaining that an appellant forfeits "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation").

> ### 3.      Plaintiff Waived Any Challenge to the ALJ's Weighing of a Treating Physician's Opinion.

As a final matter, I note that Plaintiff devotes a significant portion of his brief to reciting the law governing how an ALJ should consider a treating physician's opinion, but then fails to tether that law to a single fact in his case. (Doc. 10 at 397). As Defendant points out, Plaintiff does not name a physician, argue he or she was a treating physician, cite to any medical opinions, or make any argument as to why the ALJ's decision to assign weight to any physician was unsupported. (Doc. 12 at 15, n. 5). A recitation of the law, unmoored from any suggestion of argument, does not suffice to prevent waiver. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief . . . are waived."). Thus, I suggest that Plaintiff has waived any challenge to the ALJ's weighing of a treating physician's opinion.

### H. Conclusion

For the foregoing reasons, I suggest that the step-two error committed by the Commissioner was harmless, and Plaintiff has not raised any other arguments. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 10), be **DENIED**, that the Commissioner's Motion, (Doc. 12), be **GRANTED**, and that this case be **AFFIRMED.**

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 8, 2018                          S/ PATRICIA T. MORRIS

Patricia T. Morris
United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 8, 2018                                      By s/Kristen Castaneda
                                                             Case Manager

30